QUIÑONES, PETITIONER AND APPELLANT, *v.* CÁMARA, CONTESTANT AND APPELLEE.

APPEAL from the District Court of Mayagüez in an Action for Converting a Verbal Will into a Public Instrument.

No. 2724.—Decided June 10, 1924.

WILL—VERBAL WILL—WITNESSES—IMMINENT DANGER OF DEATH.—The provision of law that a person may make a verbal will before five witnesses without the attendance of a notary contemplates a case in which the person is in imminent danger of death, and the danger must be such as not to allow time under the circumstances for the employment of a notary because death may occur at any moment; but the existence of imminent danger of death is sufficient of itself for not calling a notary, although there may be one in the locality and he may reside near the person in such condition.

ID.—ID.—In this case it was *Held:* That although there may be notaries in the locality, this alone is no reason why a verbal will may not be made in case of imminent danger of death; yet the fact that there were notaries in the locality and they were not employed, together with other circumstances, tended to show that the danger of death was not imminent.

ID.—ID.—When in the opinion of the trial judge it is not shown that the testator was in the critical condition referred to in section 709 of the Civil Code, a will made before five witnesses is void.

ID.—ID.—In a proceeding to convert a verbal will made before five witnesses into a public instrument, if the evidence merits no credit the judge is not bound to find in accordance with the testimony of the witnesses that the testator was in imminent danger of death when the will was made.

The facts are stated in the opinion.

*Mr. A. Arnaldo Sevilla* for the appellant.

*Messrs. J. Sabater* and *J. Hernández López* for the appellee.

Mr. Justice Aldrey delivered the opinion of the court.

Buenaventura María Filomena Quiñones y Silva, known as Filomena Quiñones de Quiñones, died in San Germán, Porto Rico, on November 29, 1921, at the age of ninety years without heirs at law, and on December 12, 1921, her niece, Mary Quiñones, brought proceedings in the District Court of Mayagüez alleging that while in danger of death Filomena Quiñones, in the presence of five witnesses, made a verbal will which was reduced to writing, and praying, on the ground of her interest in the said will as legatee, that the court declare it to be the last will and testament of the said Filomena Quiñones. The petition was opposed by Fray Angel Camara as testamentary executor of the deceased, and after hearing the evidence of both parties the court denied the petition of Mary Quiñones, who took and prosecuted this appeal.

The reasons given by the lower court for not probating the will made by Filomena Quiñones before five witnesses were as follows: That Filomena Quiñones was not in imminent danger of death on November 16, 1921, when she made the verbal will before the five witnesses; that although the said witnesses were competent and witnessed the making of the will, yet by the form in which they were summoned, by their manner of testifying, by the way in which they assembled and by their conditions, they have not brought to the court the credibility and moral certainty necessary to produce conviction in the court that their declarations were the last will and testament of Filomena Quiñones; that while the testatrix was speaking Cheo Quilinche took notes that he dictated to Nadir Gutiérrez who wrote the provisions of the will, it following that the testatrix did not speak her last will to the witnesses, but to Cheo Quilinche who was not a witness to the will; that four notaries reside in San Germán and there is no evidence of the im-

possibility to get one of them to be present at the making
of the will, and six weeks before that time Filomena Qui-
ñones had made a will before one of them; that it has not
been shown clearly and positively that Filomena Quiñones
had the serious and deliberate intention of making a will;
that the witnesses were not called together by her, but by
Mary Quiñones, and they did not hear the provisions of
the will from the lips of the testatrix. All of these grounds
of the judgment appealed from are alleged by the appellant
to be erroneous.

The evidence shows that Filomena Quiñones, who was
blind, had made four wills before notaries between 1908
and September 27, 1921, when the last one of that kind
was made, two months before her death, and that in all of
them she left her property to charitable institutions in or-
der to aid and protect destitute persons, she having in her
last notarial will left all of her property to the Concepción
Hospital of San Germán where she lived and died. In the
verbal will reduced to writing, the origin of this appeal,
the sole designated heirs are her nephews and nieces, the
children of seven brothers and sisters, named individually,
and two legacies are made that appear to be important—
one to Mary Quiñones and another to her sister Julia—
besides another of $1,000 in favor of Carmen Pagán.

Filomena Quiñones died of senile cachexia, *i.e.,* old age
and attrition, on November 29, 1921, or thirteen days after
making the verbal will of November 16th. At the trial
there was introduced in evidence a certificate issued De-
cember 6, 1921, by a physician stating that on the 16th and
17th of the preceding November he attended Filomena Qui-
ñones at her residence and found her in danger of death by
senile cachexia, but with her mental faculties functioning
normally, he having attended her up to the day of her death.
In that certificate, which at the trial was acknowledged to
be true by the physician who signed it, it is not said that
on the 16th and 17th of November Filomena Quiñones was

in imminent danger of death, and in answer to questions asked him at the trial the said physician testified that he began to attend her four or five days before November 16th; that on that day he visited her from two to four o'clock of the afternoon and found her in immediate danger of death, he reaching that conclusion from her very low pulse and greatly variable respiration; that she had no chronic disease, for although she had had enteritis, she had not suffered from it since the 15th; that after the 17th she was feebler and her mind began to wander; that her grave condition on the 16th was the same that it was on the 15th; that on the night of the 17th she was still well, at least mentally, and talked and understood what was said to her; that from the 15th she had physical prostration, which was the natural consequence of her cachexia, and this condition increased until the 29th when she died; that from the 18th she lost consciousness and her mind wandered. The witnesses to the will testified as follows: José Rodríguez said that he lived about a kilometer from the house of Luis Pardo where the witnesses met together and from there it took them about five minutes to go to the home of Filomena Quiñones; that Cheo Quilinche, who dictated the will, came from Mayagüez; that there was time to get a notary to take the will; that he was the overseer of one of the legatees; that Filomena Quiñones was very feeble and said to them that she was in danger of death; that in his opinion she was dying. Nadir Gutiérrez testified that she said that she felt the hand of death; that the testatrix was very near death; in immediate danger. Luis Pardo said that she was very feeble but could speak. Luis Alberto Pardo testified that she said that she felt death and wanted to make her will; that he believed her to be in danger of death because she spoke with difficulty. Lope J. Rodríguez testified similarly to the others. The evidence shows also that on the date of the verbal will there were four notaries

in San Germán, one of whom lived within a walk of four or five minutes from the home of Filomena Quiñones.

At this point we conclude with the evidence, because in our opinion the fundamental question in this matter is whether Filomena Quiñones was in the condition defined by law for being authorized to make a verbal will.

Making a will is one of the most solemn acts in the life of man, for by it he establishes conditions to be followed after his death, and for this reason and in order that the expression of his will may appear in an authentic manner so that it can not be changed, the legislators have prescribed certain rules and requirements for the validity of wills, the regular form being that of a will made before a notary public; albeit they authorized that the services of a notary may be dispensed with under certain circumstances, one of them being that section 709 of the Civil Code provides that a verbal will may be made before five competent witnesses and without the assistance of a notary public when the testator is in imminent danger of death. And as this kind of a will is an exception to the general rule, it is necessary for its validity that it be made under the circumstances recited by the statute, so much so that although a verbal will may be made before five witnesses it will not be valid if the testator at the time is not in imminent danger of death.

With regard to wills of this kind Manresa comments as follows in volume 5, pages 571 and 572, of the third edition of his Commentaries on the Civil Code of Spain:

"The lack of notaries in small localities; reasons of economy; personal interest; desire to save trouble and avoid delay in order to take advantage of the time in which the testator has expressed a desire to make his will; fear that he may change his mind or desist from it if he have to wait for the coming of a notary living more or less distant, and many other reasons, have contributed to the fact that wills of this kind have become so general and numerous, especially in places where there are no notaries, that it may be said that this is the only form of will used in such places, always

on the pretext that the testator is more or less in imminent danger of death.

"Such abuses and the injuries that they may cause require great care and an inflexible attitude on the part of the courts called upon to intervene in the admission and elevation to public instruments of such wills, if it be not desired to return to the epoch of cedulas and memorials, with all of their inconveniences, or that in time the exception will be converted into the general rule and the law be violated or eluded, rendering ineffective the guaranties established in article 694 for all open wills made without the strong reasons that have caused the adoption of the special forms prescribed in articles 700 and 701.

"The conditions under which these exceptional wills are made do not allow that this faculty be extended beyond the reasonable limits marked by the same peremptory and extraordinary circumstance that gave rise to it; therefore, if the authority given for making them conforms to the reason that those found in such circumstances may not die intestate on account of the impossibility of waiting for the arrival of the notary, or of complying with all of the formalities necessary for the validity of the will, of course it is understood that where the said reason disappears, *i.e.*, the imminent danger of death, the faculty or exception indicated should cease.

"Consequently, in our opinion the provision of this article refers solely and exclusively to the time when the illness is so serious that all hope of salvation is lost and there is no possibility of getting a notary, for when this moment of danger is past if the sufferer is relieved to the extent that the arrival of the notary may be waited for and there is no reason for considering him in constant and imminent danger of death, then there is lack of the reason of the legislators for establishing this cause of exception, *i.e.*, the impossibility of the intervention of the notary by reason of the urgency of the circumstances.

"When in the opinion of the trial court it is not proved that the testator was in the critical circumstances required by article 700 the will is void. (Judgment of the Supreme Court of Spain of October 7, 1904.)"

In his Commentaries on the Civil Code, vol. 12, pp. 470–472, Scaevola says:

"The danger in which the testator is found for being able to take advantage of the exception extended to him by the legislators

must be urgent, menacing and imminent as said by the Code, *i.e.,* that it carries with it the fear of perhaps a very speedy and irreparable reality. For that purpose the legislators have selected the most expressive and fitting word to signify the object to which we are referring. For this reason it may be said that the word *'imminent'* of article 700 is what gives it character and what probably in each particular case will originate doubts and perplexities of importance.

"A knowledge of the practice of courts and of what occurs in sparsely populated localities in this matter leads us to sound an alarm principally to the court officials in their first categories when they may intervene in proceedings for protocolling and elevating to public instruments wills of the kind that we are considering in this commentary. It is very common that in the case of a person who is somewhat seriously ill, but not in danger of death and much less in *imminent* danger, in the localities referred to where there is no notary, the interested relatives or some officious persons, at times the testator himself, may call together the five witnesses required by article 700 and, evading the provisions of the code that establish the normal open will for normal cases of life, often to avoid what they mistakenly consider the greater expense of bringing a notary to the place from the capital of the district, adopt the exceptional form as the ordinary and current form without considering perhaps that thereby they destroy all of the security and efficacy of the statutes governing wills enacted with the design to secure their authenticity and consequently for the purpose of favoring as far as possible the interests of testators and of those who hope confidently that by virtue of the succession their lawful rights and desires may be respected. When the time comes for confirming before the court the statements that they heard from the lips of the person whom for this purpose they considered as dying, or what they saw written and was later presented to them for recognition, although not guided by the evil intention of falsifying their oaths, the witnesses testify in effect that the testator was in imminent danger of death, often not understanding the exact meaning of that expression or the purpose of it in law, or having no one to explain to them fully in common language the meaning of the phrase *'imminent danger'* in order that they may be sure that the testator was in that condition.

    *    *    *    *    *    *    *

"And we recommend to the judges of first instance extraordinary zeal and caution in guarding against those generally handy

wills of the last hour that, under the faith of five unfortunate and ignorant countrymen, are prepared by certain undertakers of last wills, feigning the desperate illness of the patient when he could then dictate his last wishes with greater tranquillity and solemnity under the more exact security given by the intervention of a notary, who is dispensed with unless he lives near the residence of the testator.''

The circumstance under which a person may make lawfully a verbal will before five witnesses is that he is in imminent danger of death, and the meaning of this is perfectly explained in the citations that we have made the same as that given in the Dictionary of the Spanish Academy in defining the adjective ''imminent'' as meaning threatening to occur immediately. Consequently, the danger of death should be of such a nature that no reasonable time is given under the circumstances for employing a notary because the death may occur at any moment.

Therefore, the fact of the existence of imminent danger of death is of itself a sufficient reason for dispensing with the services of a notary, although there may be one in the locality and although he may reside near the person who is in such condition, so that the question to be settled in this case is whether or not the danger of death of Filomena Quiñones on November 16th was imminent and of such a nature that her death might occur immediately, from one moment to another, or within a few hours.

In this case the original petition in the proceeding alleged that the testatrix was in danger of death, without saying that the danger was imminent, and the certificate of the physician presented at the trial and indentified by him did not say that on November 16th Filomena Quiñones was in *imminent* danger of death, although to questions asked him at the trial he answered that when he visited her from two to four o''clock of the afternoon of November 16th she was in immediate danger of death, in which condition she was from the 15th and also on the 17th. Filomena Quiño-

nes had no chronic disease on the 16th, but suffered only
from the natural decay produced by her ninety years of
age, and notwithstanding her immediate danger of death in
the afternoon, as testified to by the physician, the will was
not made until seven or nine hours later, or at eleven o'clock
at night after Mary Quiñones had gone to Mayagüez to
engage a notary and had returned without one because of
those there the only one she wanted was sick.

In view of these facts we agree with the lower court
that on November 16th Filomena Quiñones was not in such
imminent danger of death as to authorize her to make a
verbal will without a notary, for not only was she in that
condition since the previous day, but also on the 17th, which
shows that her immediate death was not feared; and it
seems to have been so understood, as shown by the act of
going to Mayagüez to get a notary when there were four
notaries in the locality. This appears to demonstrate a de-
sire to dispense with the services of the local notaries, in-
asmuch as it might occur to any one that it was easier to
make a will before a notary because of the practice he should
have in drafting wills than to resort to five witnesses who
are generally inexperienced, they to hear the will and re-
duce it to writing. Summarizing, although we have said
before that the presence of notaries in the locality alone is
no reason why a verbal will can not be made in case of im-
minent danger of death, yet the fact that there were nota-
ries in the locality and one was not engaged added to other
facts tends to prove that the danger of death was not im-
minent.

In addition to the testimony of the physician concerning
the immediate danger of death of Filomena Quiñones the
witnesses to the will also said something about it, rather
with reference to her statement that she felt the hand of
death than from their own knowledge; but this did not pre-
vent the judge, in view of all of the facts, from arriving at
the contrary conclusion with which we agree, albeit it may

be contended that the judge had no authority to weigh the evidence and necessarily had to give credit to the witnesses and the physician and decide on their testimony that the testatrix was in imminent danger of death.

Here we might conclude this opinion on that point in view of the conclusion reached, but we think it well to add that another of the grounds for the judgment of the lower court appears to be justified by the evidence. In fact the court *a quo* did not give credit to the witnesses to the will because of their manner of testifying, and in going over their testimony we find that Luis Pardo affirmed as true something that was unknown to him and that was false, for he testified that Filomena Quiñones died at four o'clock in the morning of the day after the verbal will was made, when the fact is that she died thirteen days thereafter. José Rodríguez first testified that Filomena Quiñones wanted her property to be divided equally among her nephews and nieces and later said that she desired to make three legacies to them and divide the balance equally *among the others,* thus according to the will reduced to writing she designated as heirs all of her nephews and nieces, leaving legacies to two of them and another to Carmen Pagán who does not appear to be a niece. The written will was read twice to the testatrix; first by Nadir Gutiérrez to whom it was dictated by Cheo Quilinche who was not a witness, and later by Lope Rodríguez, and on this point José Rodríguez testified that the testatrix agreed to the will when it was read and that he did not know why it was read the second time, but that the testatrix asked that it be read the second time. Luis Pardo and Lope Rodríguez testified that she asked the latter to read it the second time, while Nadir Gutiérrez testified that it was read for the second time in order to read it more perfectly and at the request of the testatrix because she did not understand it well, saying later that it was read for the second time at the request of all of the witnesses for the reason that Nadir

did not read it well. Luis A. Pardo testified that it was read for the second time in order to give it more importance; in order that it should be heard well. Also there was contradiction about who furnished the paper for the will, some of the witnesses saying that it was Cheo Quilinche and others that it was Mary Quiñones.

In view of these contradictions we can not hold that the lower court was not justified in not giving credit to the witnesses to the will.

The judgment appealed from is

*Affirmed.*

Justices Wolf and Franco Soto concurred.

Chief Justice Del Toro and Justice Hutchison dissented.